ATTORNEYS FOR APPELLANTS
Bryan H. Babb
Kelly M. Scanlan
Indianapolis, Indiana

Milford M. Miller
Fort Wayne, Indiana

ATTORNEYS FOR AMICUS CURIAE
Defense Trial Counsel of Indiana
R. Thomas Bodkin
James D. Johnson
Evansville, Indiana

ATTORNEY FOR APPELLEE
John F. Muller
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
Indiana Trial Lawyers Association
Steven L. Langer
Valparaiso, Indiana

Tara M. Wozniak
Indianapolis, Indiana



# In the
# Indiana Supreme Court

No. 34S02-1009-CV-476

HOWARD REGIONAL HEALTH SYSTEM d/b/a
HOWARD COMMUNITY HOSPITAL,
CHARLES G. MARLER, M.D., and
COMMUNITY FAMILY HEALTH CENTER,

*Appellants (Defendants below),*

v.

JACOB Z. GORDON b/n/f/ LISA GORDON,

*Appellee (Plaintiff below).*

Interlocutory Appeal from the Howard Superior Court 2, No. 34D02-0609-CT-0782
The Honorable Rosemary Higgins Burke, Senior Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 34A02-0902-CV-179

**August 10, 2011**

**Shepard, Chief Justice.**

Jacob Gordon's mother sued Howard Community Hospital, alleging it committed medical malpractice while caring for her son. In another count of the complaint, she sought separate damages for spoliation, saying the Hospital had lost certain medical records associated with Gordon's care and that this loss made it impossible for Gordon to pursue a medical malpractice claim against one of his doctors, who was also a defendant.

As we explain below, many of the considerations that led us to decline to recognize first-party spoliation in <u>Gribben v. Wal-Mart Stores, Inc.</u>, and to decline to recognize third-party spoliation in <u>Glotzbach v. Froman</u> in the context of workers' compensation, apply here.

## Facts and Procedural History

On January 6, 1999, Lisa Gordon was admitted to Howard Community Hospital in labor.[1] Dr. Richard A. Gard had provided Lisa's prenatal care. He delivered Jacob Gordon by caesarian section after determining the baby was in a breech position, on January 7, 1999, at 2:30 p.m. Sometime thereafter it became apparent that Jacob suffered from numerous serious disorders. The Gordons believe that Jacob's conditions may have been caused by substandard medical care at the time of his birth.

Counsel for Lisa Gordon first requested medical records from the Hospital in December 2003 and then on into 2004. Counsel made additional requests after it became apparent that there were gaps in the medical records turned over.

---

[1] The actual legal entity is Howard Regional Health System. We will sometimes call it "Howard Regional" or "Howard Community" or simply "the Hospital."

In September 2005, the Gordons filed a complaint for damages with the Indiana Department of Insurance as required by the Medical Malpractice Act. The complaint named Howard Regional as the sole defendant and alleged that one of the hospital nurses did not conform to the applicable standard of medical care, causing damage to Jacob Gordon.

On March 27, 2006, the Gordons filed a motion to compel discovery in Howard Circuit Court. The Hospital filed affidavits dated June 5, 2006, stating that some of the records could not be located. The missing records included nursing and narrative notes from 7:45 p.m. January 6 through 2:30 p.m. January 7; labor flow records from 6 a.m. through 2:30 p.m. January 7; fetal heart monitor strips from 5:52 a.m. through 2:30 p.m. January 7; and peri-operative nurses' notes from the caesarian section performed on January 7. (App. at 51.)

In September 2006, the Gordons filed an amended complaint naming three additional defendants: Dr. Gard, Dr. Charles G. Marler, and Community Family Health Center. This new complaint enumerated five counts: Count I, medical negligence against Howard Regional; Count II, third-party spoliation of evidence against Howard Regional; Count III, medical negligence against Dr. Gard; Count IV, medical negligence against Dr. Marler; and Count V, vicarious liability against Community Family Health Center.

The Gordons moved for partial summary judgment against Howard Regional only with respect to Count II, the third-party spoliation claim. In support, they tendered the affidavit of a neonatologist retained by the Gordons stating she could not determine whether the standard of care was met because of the missing medical records. Howard Regional responded to that motion and likewise filed a cross-motion for partial summary judgment. After a hearing on these cross-motions, the trial court granted the Gordons partial summary judgment and authorized an interlocutory appeal by Howard Regional.

The trial court concluded that Howard Regional had a duty to maintain the Gordons' medical records at least through the time of the Gordons' records request. It also concluded that under Indiana law a separate cause of action for failure to maintain these records existed and that the Hospital had breached its duty to maintain records under Indiana Code Section 16-39-7-1.

3

The trial court held that Howard Regional "ha[d] created a significant gap in the records that would allow a medical panel or a factfinder to determine whether the care that was provided . . . met the relevant standard." (App. at 200–01.)

Howard Regional appealed and the Court of Appeals affirmed. Howard Reg'l Health Sys. v. Gordon, 925 N.E.2d 453 (Ind. Ct. App. 2010). We granted transfer, 940 N.E.2d 823 (Ind. 2010) (table), thus vacating the opinion of the Court of Appeals.

**General Contentions**

Howard Regional contends the Gordons' spoliation claim is within the purview of the Medical Malpractice Act and thus a medical review panel must give its opinion before an action against the Hospital may commence. (Appellant's Br. at 10–11.) The Gordons contend their claim for spoliation "is a totally separate claim—distinct from the medical malpractice claim." (Appellee's Br. at 7.)

**Preserving Medical Records and the Medical Malpractice Act**

Two threshold questions about the Gordons' claim are whether it falls within the general scope of the Medical Malpractice Act and whether Indiana's statute on maintenance of health records statute creates a private right of action. We review such questions of statutory interpretation under a de novo standard and owe no deference to a trial court's legal conclusions. South Bend Tribune v. South Bend Cmty. Sch. Corp., 740 N.E.2d 938 (Ind. 2000).

Indiana courts understand the Malpractice Act to cover "curative or salutary conduct of a health care provider acting within his or her professional capacity," Murphy v. Mortell, 684 N.E.2d 1185, 1188 (Ind. Ct. App. 1997), but not conduct "unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." Collins v. Thakkar, 552 N.E.2d 507, 510 (Ind. Ct. App. 1990). To determine whether the Act is

4

applicable, the court looks to the substance of a claim. <u>Van Sice v. Sentany</u>, 595 N.E.2d 264 (Ind. Ct. App. 1992).

Thus, regardless of what label a plaintiff uses, claims that boil down to a "question of whether a given course of treatment was medically proper and within the appropriate standard" are the "quintessence of a malpractice case." <u>Id.</u> at 267 (plaintiff's claims of fraud and battery fell within the Malpractice Act because the first was essentially a claim that the defendant failed to adhere to a standard of care and the second was a claim that the defendant did not obtain informed consent for a procedure); <u>Popovich v. Danielson</u>, 896 N.E.2d 1196, 1202–04 (Ind. Ct. App. 2008) (though styled as assault and battery, fraud, breach of contract, and defamation, all plaintiff's claims involved defendant's exercise of professional judgment and involved actions taken while providing medical care and thus the requirements of the Act applied).

By contrast, to fall outside the Malpractice Act a health care provider's actions must be demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment. <u>Kuester v. Inman</u>, 758 N.E.2d 96 (Ind. Ct. App. 2001); <u>Collins</u>, 552 N.E.2d at 510 (Ind. Ct. App. 1990) (Act held inapplicable in cases where the conduct involved was "unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill or judgment").

Splitting out separate actions by a provider has usually been held contrary to the Act. In determining that both the activity of credentialing and medical malpractice should be <u>reviewed together</u> under the Act, the Court of Appeals explained the landscape well:

> Viewed from the historical perspective we believe the conclusion is inescapable that our General Assembly intended that all actions the underlying basis for which is alleged medical malpractice are subject to the act. [T]he obvious purpose of the act is to provide some measure of protection to health care providers from malpractice claims, and to preserve the availability of the professional services of physicians and other health care providers in the communities and thereby protect the public health and well-being[.]

5

Winona Mem'l Hosp., LP v. Kuester, 737 N.E.2d 824, 828 (Ind. Ct. App. 2000) (quoting Sue Yee Lee v. Lafayette Home Hosp., Inc., 410 N.E.2d 1319, 1324 (Ind. Ct. App. 1980)).[2]

The Gordons' underlying claim in Count II alleges medical malpractice because the "[m]aintenance of health records by providers" is so closely entwined with health care and because records in general are so important to a medical review panel's assessment of whether the appropriate standard of care was met. Ind. Code §§ 16-39-7-1, 34-18-10-22(a). The Gordons rightly acknowledge how important health care records are for "the nature and quality of the health care provided, for billing purposes, and peer review." (Appellee's Br. at 16.) (emphasis added)  Surely the skillful, accurate, and ongoing maintenance of test and treatment records bears strongly on subsequent treatment and diagnosis of patients. It is a part of what patients expect from health care providers. It is difficult to contemplate that such a service falls outside the Act.

We thus move to the Gordons' contention that the statute on maintenance of health records creates a private right of action separate from the Medical Malpractice Act. The Gordons maintain that the enactment of new subsection (d) "implicitly recognizes that there is civil liability on the part of a healthcare provider if it violates Ind. Code § 16-39-7-1." (Appellee's Br. at 20.)

"We have long-standing analytical tools for addressing whether a statute contains an implied private right of action." Kho v. Pennington, 875 N.E.2d 208, 218 (Ind. 2007) (Sullivan, J., concurring in part and dissenting in part). Determining whether a civil cause of action exists

_____

[2] Parents contended their trial court complaint represented an independent action for damages outside the purview of the Act. The parents believed their claim for the loss of services of their child and for medical expenses was outside the Act because they were never patients of the defendant health care providers, either under the statutory definition or under recognized definitions of the term, and they were not suing in representative capacity. The court held the parents' right of action was derived from a claim of medical malpractice and thus covered by the Act. Sue Yee Lee, 410 N.E.2d at 1324.

begins with an examination of legislative intent. <u>Estate of Cullop v. State</u>, 821 N.E.2d 403 (Ind. Ct. App. 2005).

A private party may not usually enforce rights under a statute designed to protect the public in general and which contains an enforcement provision. <u>Id.</u> "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." <u>Id.</u> at 409 (quoting <u>Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers</u>, 414 U.S. 453, 459 (1974)). Whether a statute creates a private right of action is a question of law for the court. <u>See Blanck v. Ind. Dep't of Corr.</u>, 829 N.E.2d 505 (Ind. 2005).

As it existed in 2008 and during the earlier period of the events surrounding Jacob Gordon's birth, Chapter 16-39-7 of the Indiana Code ("Maintenance of Health Records, X-Rays, and Other Tests") provided, in language that is still in the Code:

> Sec. 1. (a) As used in this section, "provider" means the following:
> * * *
> (13)  A hospital or facility licensed under IC 16-21-2 or IC 12-25 or described in IC 12-24 or IC 12-29.
>   (b) A provider shall maintain the original health records or microfilms of the records for at least seven (7) years.
>   (c) A provider who violates subsection (b) commits an offense for which a board may impose disciplinary sanctions against the provider under the law that governs the provider's licensure, registration, or certification under this title or IC 25.

Effective July 1, 2009, the legislature added subsection (d):

> (d) A provider is immune from civil liability for destroying or failing to maintain a health record in violation of this section if the destruction or failure to maintain the health record occurred in connection with a disaster emergency as declared by the governor under IC 10-14-3-12 or other disaster, unless the destruction or failure to maintain the health record was due to negligence by the provider.

Ind. Code § 16-39-7-1.

The legislative genealogy of these provisions sheds light on the issue at hand. Subsections (a) through (c) previously appeared in Indiana Code § 16-4-8-2 (1992). In 1993, the General Assembly created Chapter 16-39-7 and placed (a) through (c) there. At the same time, it added Section 2, addressing the "Maintenance of x-rays by providers; mammograms; violations; civil liability." P.L. 2-1993, § 22; Ind. Code § 16-39-7-2 (1993).[3] The addition of subsection (d) to Section 1 in 2009 came after the Gordons filed their complaint.

As the statutes existed at the time of Jacob's birth, a violator of Chapter 7, Section 1, would be subject to disciplinary sanctions under the law that governs the provider's licensure, registration, or certification under Title 16 or Title 25. By contrast, a violator of Section 2 would be exposed to the same disciplinary sanctions but would possess substantial immunity created by subsection (e).[4] The language of subsection (e) in Section 2 is similar to the language added in 2009 to subsection (d) of Section 1. Recalling that Sections 1 and 2 were crafted at the same time, the legislature could have created civil liability for a violation of Section 1 and did not do so. This differential treatment says a fair amount about legislative intent as respects the law at the time relevant to this lawsuit.

Moreover, the structure of Section 1(d) reads largely as a grant of immunity to hospitals that lose records due to natural disasters. It was enacted in the wake of a storm that destroyed the medical records of a leading hospital.[5] We conclude that neither the rules of statutory

---

[3] In 2001, the General Assembly amended Section 2 to create an exception for "original mammograms" which were to be governed under a newly added section 3 of the chapter. P.L. 177-2001, § 7; Ind. Code 16-39-7 (2001).

[4] The provision about maintaining x-rays declared that a provider was immune from civil liability where the loss of records was "inadvertent and not done in bad faith." Ind. Code § 16-39-7-2(e).

[5] Kirk Johannesen, Lingering issue, The Republic, Jun. 6, 2011, www.therepublic.com/view/local_story/ lingering_issue_1307409970 (Columbus Plan Commission to hear the results of an engineering study commissioned by Cummins Inc. and Columbus Regional Hospital after June 2008 floods caused a combined $391 million in damage to the two organizations); Anne Vazquez, Flooded Hospital Shortens A Long Road Back, Today's Facility Manager Facility Blog (May 29, 2009, 9:13 AM), www.todaysfacility manager.com/facilityblog/2009/05/web-exclusive-flooded-hospital-shortens-a-long-road-back.html

construction nor the history of the enactment lead to the idea that Section 1(d) confers a private remedy for the Gordons.

## Is This "First-Party" or "Third-Party"?

In 2005, we addressed claims of spoliation in answering two certified questions from the United States District Court for the Southern District of Indiana. The questions were

> 1. Does Indiana law recognize a claim for "first-party" spoliation of evidence; that is, if an alleged tortfeasor negligently or intentionally destroys or discards evidence that is relevant to a tort action, does the plaintiff in the tort action have an additional cognizable claim against the tortfeasors for spoliation of evidence?
>
> 2. If so, what are the elements of the tort, and must a plaintiff elect between pursuing the spoliation claim and utilizing an evidentiary inference again the alleged tortfeasor in the underlying action?

Gribben v. Wal-Mart Stores, Inc., 824 N.E.2d 349, 350 (Ind. 2005). Our answers were limited to first-party spoliation, as distinguished from third-party spoliation, and we differentiated the types. First-party spoliation refers to the spoliation of evidence by a party to the principal litigation. Id. (citing Temple Cmty. Hosp. v. Superior Court, 976 P.2d 223 (Cal. 1999)). Third-party spoliation refers to spoliation by a non-party. Id.

This seems to be the widely accepted view of spoliation, even among those courts which have chosen not to recognize independent spoliation claims of either type. See generally Lips v. Scottsdale Healthcare Corp., 229 P.3d 1008 (Ariz. 2010) (Arizona does not recognize a cause of action for first-party spoliation of evidence or negligent spoliation of evidence); Martino v. Wal-Mart Stores, Inc., 908 So. 2d 342 (Fla. 2005) (appropriate remedies for a first-party spoliation

---

(Columbus Regional Hospital reopened in less than five months after the laboratory, pharmacy, IT center, radiology equipment, medical records, and food service facility that were housed in the hospital's basement were destroyed during a June 2008 flood).

claim are discovery sanctions and a rebuttable presumption of negligence for the underlying tort); Teel v. Meredith, 774 N.W.2d 527 (Mich. Ct. App. 2009) (Michigan law does not recognize a cause of action for spoliation of evidence that interferes with a prospective civil action against a third party); Pikey v. Bryant, 203 S.W.3d 817 (Mo. App. 2006) (plaintiff's spoliation claim required more than the fact that potential evidence was intentionally destroyed); Timber Tech Engineered Bldg. Prods. v. Home Ins. Co., 55 P.3d 952 (Nev. 2002) (no independent tort for spoliation of evidence regardless of whether it is committed by a first or third party); Metlife Auto & Home v. Joe Basil Chevrolet, Inc., 753 N.Y.S.2d 272 (N.Y. 2002) (declining to recognize negligent third-party spoliation).

Our decision in Gribben to forgo recognizing a distinct cause of action for first-party spoliation likewise comports with the approach of many courts that have instead addressed such allegations in the underlying litigation through sanctions, including adverse inference instructions and other mechanisms. See Cedars-Sinai Med. Ctr. v. Superior Court (Bowyer), 954 P.2d 511, 517 (Cal. 1998) ("[T]here are a number of nontort remedies that seek to punish and deter the intentional spoliation of evidence. Chief among [which] is the evidentiary inference that evidence which one party has destroyed or rendered unavailable was unfavorable to that party."); see also Leon v. IDX Sys. Corp., 464 F.3d 951, 958, 960–63 (9th Cir. 2006) (affirming dismissal against party for bad faith destruction of relevant evidence); cf. Ind. Trial Rule 37 (a court may sanction a party, including dismissal of a claim or defense, for failing to comply with a discovery order).

Numerous federal decisions outline the purpose of such sanctions and the range available. The courts have recognized several purposes for imposing spoliation sanctions:

> If spoliation has occurred, the court should design sanctions "to: (1) deter parties from engaging in spoliation; (2) place the risk of erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he [or she] would have been in absent the wrongful destruction of evidence by the opposing party.'"

10

Consol. Edison Co. of New York v. U.S., 90 Fed. Cl. 228, 257 (Fed. Cl. 2009) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). Potential sanctions for spoliation include "from least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010) (footnotes omitted). In one widely cited opinion, the court explained that it would be difficult to come up with a detailed approach to sanctions that would apply in every case:

> Applying a categorical approach to sanctions issues is also difficult . . . . Determining whether sanctions are warranted and, if so, what they should include, requires a court to consider both the spoliating party's culpability and the level of prejudice to the party seeking discovery. Culpability can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation. Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof. A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice. Even if there is intentional destruction of potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence. And even if there is an inadvertent loss of evidence but severe prejudice to the opposing party, that too will influence the appropriate response, recognizing that sanctions (as opposed to other remedial steps) require some degree of culpability.

Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010).

Our decision in Gribben rested partly on similar analysis. In declining to recognize first-party spoliation claims we concluded,

> Notwithstanding the important considerations favoring the recognition of an independent tort of spoliation by parties to litigation, we are persuaded that these are minimized by existing remedies and outweighed by the attendant disadvantages. We thus determine the common law of Indiana to be that, if an alleged tortfeasor negligently or intentionally destroys or discards evidence

11

that is relevant to a tort action, the plaintiff in the tort action does not have an additional independent cognizable claim against the tortfeasor for spoliation of evidence under Indiana law.

Gribben, 824 N.E.2d at 355. We did acknowledge that fairness and integrity of outcome and deterrence might require a separate tort remedy against persons who are not parties to the principal litigation, but as the certified question did not necessitate examination of third-party spoliation, we did not address it further.

The following year in Glotzbach v. Froman, we first considered whether an employee could sue his employer in tort, outside the Worker's Compensation Act, for loss of evidence about his injury on the job, evidence said to be needed for litigation against the maker of a pump that exploded at the worksite. 854 N.E.2d 337 (Ind. 2006). We concluded the disadvantages in first-party spoliation militated against recognizing a third-party claim in that setting:

> Proving damages in a third-party spoliation claim becomes highly speculative and involves a lawsuit in which the issue is the outcome of another hypothetical lawsuit. The jury must somehow find all the elements of a product liability case, immediately determining whether a product defect caused the injury, as opposed to inadequate maintenance, or other intervening events. The jury would be asked to determine what the damages would have been had the evidence been produced and what the collectibility of these damages would have been. We think this exercise often could properly be described as "guesswork."

Id. at 341 (citing Petrik v. Monarch Printing Corp., 501 N.E.2d 1312, 1320 (Ill. App. Ct. 1986)).

Necessarily working from the background of Gribben and Glotzbach, and our observation that fairness and integrity of outcome might sometime require recognizing such a claim, the Gordons urge that theirs is an instance warranting an independent tort for third-party spoliation. The theory runs like this: when it comes time to prove the Gordons' claim against Dr. Gard, the Hospital's loss of medical records hinders their ability to pursue a claim against Dr. Gard. Thus, they say, the Hospital is a third party against whom a separate tort for spoliation is needed. The Hospital, of course, is also a first-party defendant.

12

We conclude that splitting up the defendants, and the counts against them, blurs the distinction between actual defendants and others who may possess evidence but are not parties to the litigation. What the Gordons' case presents is really a claim for first-party spoliation, carrying the same advantages and disadvantages we weighed in Gribben and Glotzbach.

**As a "Preliminary Question of Law"**

In the alternative, the Gordons contend the trial court could hear their request for summary judgment as a preliminary determination of an affirmative defense or issue of law or fact. Ind. Code § 34-18-11-1 (2008). The Medical Malpractice Act generally requires that actions for medical negligence against health care providers must first be submitted to, and an opinion given by, a medical review panel before commencing an action in court. Ind. Code § 34-18-8-4. A trial court's authority to rule on preliminary matters is to be narrowly construed. Griffith v. Jones, 602 N.E.2d 107 (Ind. 1992).

The Gordons' motion for partial summary judgment sought a finding of liability against the Hospital for the count alleging spoliation. As we have declined to recognize that count as representing a separate cause of action, the Hospital was entitled to summary judgment on that claim and the trial court must be reversed as respects that count.

Whether the Gordons are entitled to any sanctions against the Hospital for the loss of records in question is an intensively fact-sensitive inquiry. In the current state of the proceeding, relatively little is known of record about the role of the missing evidence as respects the claims against the various defendants, how and when and by whom the records went missing, the nature and availability of other evidence that may bear on the Gordons' malpractice claims, and so on. In the course of further proceedings before the medical review panel and the trial court thereafter, a good deal more is likely to be learned about these facts and about whether a litigation sanction against the Hospital is warranted.

13

**Conclusion**

We reverse the judgment of the trial court.

Sullivan, Rucker, and David, JJ., concur.

Dickson, J., concurs in result with separate opinion.

**Dickson, Justice, concurring in result.**

In its order granting the Gordons' motion for partial summary judgment, the trial court set forth the undisputed facts. Lisa Gordon was admitted to the Hospital on January 6, 1999, and that after a difficult labor, it was determined that "the neonate was in a breech position." Jacob Gordon was "delivered by a low transverse caesarian section" at 2:30 on January 7, 1999, and during his hospital stay "became septic and developed a subdural hematoma" and other "abnormal neurological, respiratory and cardiac conditions." Despite several unsuccessful attempts by the Gordons' counsel to obtain the medical records, the Hospital reported as "missing" the nursing and narrative notes for January 6, 1999 from 7:45 p.m. through 2:00 p.m. on January 7, labor flow records for January 7 from 6:00 a.m. through 2:00 p.m., fetal heart monitor strips for January 7 from 2:50 a.m. through 2:00 p.m., and peri-operative nurses notes from the January 7 c-section. Appellant's App'x at 199–200.

On September 27, 2005, the Gordons filed with the Department of Insurance a proposed complaint against the Hospital for medical malpractice, pursuant to the Indiana Medical Malpractice Act. On September 5, 2006, the Gordons amended their proposed complaint, adding as additional defendants Dr. Richard Gard, Dr. Charles Marler, and Community Family Health Center. This amended complaint asserted medical negligence claims against the Hospital and each of the other defendants and in addition asserted in Count II a separate claim for "Third-Party Spoliation of Evidence" against the Hospital. Three days later, the Gordons filed the present action, Count I of which asserts "Third-Party Spoliation of Evidence" against the Hospital, alleging that the missing records are essential to Jacob's claims for medical negligence and that the Hospital's spoliation of evidence proximately caused damage to Jacob. *Id*. at 6–8. The Gordons sought an order granting partial summary judgment against the Hospital "as to the issues of liability and proximate causation," claiming that the Hospital breached its duty to maintain medical records and that such breach "makes it impossible for the plaintiff to pursue his medical malpractice claims both as to the issue of liability and as to the issue of proximate causation." *Id.* at 24. The motion also requested a hearing on the sole remaining issue of damages. The trial court granted the Gordons' motion and directed that its ruling be certified for interlocutory appeal at the Hospital's request.

I respectfully depart from today's majority opinion on several points but ultimately agree to reverse the grant of partial summary judgment, although on grounds not advanced by my colleagues.

I first disagree with the Court's view that the Gordons' spoliation claim against the Hospital should generally be deemed a claim of medical malpractice governed by the Indiana Medical Malpractice Act. Rather, I am in accord with the thoughtful analysis of the Court of Appeals, which emphasizes that the essence of the claimed misconduct by the Hospital in losing or destroying crucial records does not involve any exercise of professional medical judgment or care by the Hospital, and thus should not be subject to Act. Howard Regional Health System v. Gordon, 925 N.E.2d 453, 460 (Ind. Ct. App. 2010).[1] More problematic to the Gordons is their express inclusion of a third-party spoliation claim against the Hospital in their already-pending proposed complaint under the Medical Malpractice Act. Whether this should have precluded jurisdiction of the trial court in the present action is not addressed by the trial court's grant of partial summary judgment, nor by the majority today.

In addition, I depart from my colleagues' unwillingness to hold that a violation of Indiana Code Section 16-39-7-1, requiring the Hospital to maintain its medical records, may support a private cause of action for negligence *per se*. In my view, the Court of Appeals comprehensively examined this question, properly applying our analysis in Kho v. Pennington, 875 N.E.2d 208 (Ind. 2007), and other relevant authorities, to conclude that the statute "imposes on entities subject to the statute a duty to maintain their health records, and that a breach of that duty is negligence *per se.*" Gordon, 925 N.E.2d at 463.

Finally, with respect to the spoliation claim, the Court explains its decision to treat the

---

[1] If the spoliation claim falls within the Medical Malpractice Act, then the propriety of the Gordons' spoliation claim is not properly before the trial court, or this Court.

2

Gordons' spoliation action against the Hospital as a prohibited claim for first-party spoliation for the reason that it carries the same advantages and disadvantages as first-party claims. The import of this rationale is that, in their claims for medical negligence against the separate health care providers, the plaintiffs would be entitled to remedies penalizing the independent providers for the Hospital's loss or destruction of crucial medical records. I do not agree that such non-Hospital defendants should be subjected to jury instructions authorizing adverse inferences of medical negligence, to the preclusion of defenses such as denial of negligence, or to other such remedies by reason of the Hospital's misconduct. I thus disagree with the Court's treating all the defendants together to characterize the claim against the Hospital as one for first-party spoliation. The trial court correctly determined that, to the extent that the Gordons are claiming the loss of records impairs their medical negligence claim against the Hospital, such claim is a "first-party" spoliation claim. But as to the Gordons' claim that the Hospital's spoliation impedes their medical negligence claims against the other defendants, such claims are "third-party" spoliation claims.

While departing from the majority's view that the Gordons' claim against the Hospital is a prohibited first-party spoliation claim, I agree to reverse the trial court's grant of partial summary judgment favoring the Gordons because of my belief that Indiana common law should not be expanded to permit third-party spoliation claims. In Gribben v. Wal-Mart Stores, Inc., 824 N.E.2d 349, 355 (Ind. 2005), which involved a claim of first-party spoliation, we nevertheless acknowledged without holding that in third-party claims, "the fairness and integrity of outcome and the deterrence of evidence destruction may require an additional tort remedy when evidence is destroyed or impaired by persons . . . not subject to existing remedies and deterrence." In a subsequent case involving alleged third-party spoliation by the employer of an injured worker, we discussed the problem of proving causation and damages:

> Proving damages in a third-party spoliation claim becomes highly speculative and involves a lawsuit in which the issue is the outcome of another hypothetical lawsuit. The jury must somehow find all the elements of a product liability case, immediately determining whether a product defect caused the injury, as opposed to inadequate maintenance, or other intervening events. The jury would be asked to determine what the damages would have been had the evidence been produced and what the collectibility of these damages would have been. We think this exercise often could properly be described as "guesswork."

3

<u>Glotzbach v. Froman</u>, 854 N.E.2d 337, 341 (Ind. 2006).  Notwithstanding the "fairness and integrity of outcome" concerns in <u>Gribben</u>, upon further reflection I am persuaded that the problem of uncertain and speculative causation and damages will be a fatal obstacle to most third-party spoliation claims.  Sympathy for the resulting wrongful harm incurred cannot, in my view, obviate the traditional tort law requirements for adequate proof of damages and causation.

The trial court granted partial summary judgment as to the Gordons' third-party spoliation claim, finding that the Hospital breached its duty to maintain medical records, that the missing records are essential to the Gordons' claims for medical negligence, and that the Hospital's spoliation of evidence proximately caused damage to Jacob Gordon.  While I conclude that (a) the Gordons' spoliation claim does not necessarily fall within the constraints of the Indiana Medical Malpractice Act; (b) the undisputed evidence establishes that the Hospital breached its statutory duty to maintain medical records; and (c) the Gordons' claim against the Hospital for loss of records that impairs their claims against the non-Hospital defendants is for third-party, not first-party spoliation; I am nevertheless persuaded that the elements of proximate cause and damages are not established in this third-party spoliation case.  It is for this reason that I agree to reverse the grant of partial summary judgment.

4